UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
:
MICHELLE G. VALENTINE, :
:
:
Plaintiff, :
: 18-CV-795 (JMF) (KNF)
-v- :
: OPINION AND ORDER
:
ANDREW M. SAUL, Commissioner of Social Security, :
:
Defendant.[1] :
:
------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

Plaintiff Michelle Valentine ("Valentine") brings this action pursuant to the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging a final decision of the Commissioner of Social Security (the "Commissioner") finding her ineligible for disability insurance benefits ("DIB") and supplemental security income ("SSI"). The parties' cross-motions for judgment on the pleadings were referred to Magistrate Judge Kevin N. Fox for a Report and Recommendation. In a Report and Recommendation filed on August 16, 2019, ECF No. 23 ("R&R"), Magistrate Judge Fox recommended that the Commissioner's motion for judgment on the pleadings be denied and that Valentine's motion for judgment on the pleadings be granted by reversing the Commissioner's decision and remanding the case for a rehearing. R&R at 18. Valentine timely objected to Magistrate Judge Fox's recommendation on the ground that the case should be remanded solely to for the calculation of benefits. *See* ECF No. 24, Plaintiff's Objections ("Plf.'s Obj."), at 10. The Court agrees with Valentine.

---

[1] On June 17, 2019, Andrew M. Saul became the Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, he is substituted as Defendant. The Clerk of Court is directed to modify the caption accordingly.

## BACKGROUND

Valentine seeks DIB and SSI for the period between January 1, 2015, when she alleges her disability began, *see* Administrative Record ("R.") at 211, and December 31, 2015, the last date on which she met the insured status requirements of the Act, R. 12. Valentine claims that she was disabled during that period as a result of several impairments, principal among which were degenerative disc disease of the lumbar spine, degenerative joint disease of the knees, bilateral carpal tunnel syndrome, obesity, foot problems, and depression. *See* ECF No. 18 ("Plf.'s Mot."), at 7-13. (Valentine has other ailments, but she acknowledges that they are "largely irrelevant to her claims" for disability. Plf.'s Mot. 7.)

Valentine sought treatment for her degenerative disc disease of the lumbar spine throughout 2015 and 2016. On March 6, 2015, Valentine visited Dr. Gabriel Dassa, an orthopedic surgeon, who, after an exam, diagnosed lumbar radiculopathy and ordered a lumbar MRI to determine whether any discs were herniated. *See* R. 511. The MRI was conducted on April 9, 2015, and results indicated that there were broad-based disc herniations at four levels of the thoracic and lumbar spines, disc bulging at one level, and posterior disc herniation at a fifth level, and that discs at five spinal levels were desiccated. *See* R. 467-68. On April 12, 2016, Valentine visited Dr. Joshua Auerbach, another orthopedic surgeon, who reviewed Valentine's MRI results, conducted an exam, and diagnosed grade one degenerative spondylolisthesis and spinal stenosis. R. 567. Dr. Auerbach concluded that, "[g]iven the multi-level nature of [Valentine's] disease, it is unlikely that any surgery will be of any actual benefit to her," but believed that a procedure fusing her spine at one level may address instability at that level. R. 567. Dr. Auerbach referred Valentine to a neurosurgeon for a second opinion. *Id.* Valentine visited Dr. Ramesh Babu on November 16, 2016, and Dr. Babu recommended "continued

conservative treatment," given that the "amount of [degenerative disc disease] and 3 black discs would require extensive fusion and instrumentation." R. 622. On December 12, 2016, Dr. Auerbach completed a form indicating that, in an eight-hour workday, Valentine could sit for only about four hours and stand or walk for less than two hours, "with frequent breaks." R. 800.

Valentine sought treatment for her degenerative joint disease of the knees beginning in May 2013. *See* R. 350-57. An MRI conducted on May 22, 2013, showed, in the left knee, mild degenerative changes, mild to moderate swelling, a small Baker's cyst, and mild chondromalacia. R. 348. When Valentine visited Dr. Randall T. Rust, an orthopedic surgeon and knee specialist, in August 2013, examination revealed no appreciable swelling, but her knee condition was otherwise unchanged. R. 363-65. Dr. Rust concluded that Valentine could not stand for more than three hours per day. R. 373. Valentine's condition worsened in 2015. When Valentine visited Bronxcare in January 2015, her arthritis affected both knees, her knee movements were painful, and her range of motion was restricted. R. 472-73. During a March 6, 2015 visit to Dr. Dassa, Dr. Dassa diagnosed bilateral knee instability and ordered an MRI. R. 511. The MRI, conducted on March 13, 2015, revealed, among other things, chondromalacia, joint effusion, and meniscal tears in both knees. R. 793-94. On October 9, 2015, Ms. Valentine saw Dr. Morteza Meftah, a Bronxcare physician, who diagnosed a deformity of her knee, "medial joint space narrowing, osteophyte formation and moderate arthritic changes." R. 569. Dr. Meftah gave Valentine a cortisone injection in her left knee. *Id.* Physical therapy notes from November 2016 state that Valentine showed "decreased functional activities due to pain, tenderness, swelling, decreased range of motion, [and] muscle strength," R. 632, and indicate that she required a cane to walk, R. 631.

Valentine has long had pain related to carpal tunnel syndrome as well. For instance, on January 28, 2010, Dr. Allen S. Glushakow, an orthopedic surgeon, diagnosed Valentine with bilateral carpal tunnel syndrome and recommended surgery on her right hand and a splint for her left hand. R. 323-24. Valentine visited Dr. Rust three times in the latter half of 2012, during which time Dr. Rust concluded that her symptoms were "not entirely consistent" with carpal tunnel syndrome. R. 368. On November 13, 2015, however, Dr. Glushakow concluded that Valentine's condition had worsened and advised "reexploration of" her right wrist. R. 598. During a May 13, 2016 visit, Dr. Glushakow found that Valentine's right thumb had a moderate degree of atrophy, R. 592, and noted that she was "unable to perform" personal tasks such as combing her hair, brushing her teeth, and dressing, R. 591. Dr. Glushakow also concluded that both hands' fine and gross manipulations were "substantially impaired" by her carpal tunnel syndrome "in terms of speed and accuracy and "can only be engaged in occasionally or seldom during an eight hour day." R. 593.

Valentine also suffered from obesity during the period in question. For much of 2015, Valentine's BMI was above forty, constituting "extreme" obesity. *See, e.g.*, R. 509 (March 2, 2015); R. 521 (April 14, 2015); R. 528 (May 11, 2015). Dr. Adrianna Gioia and Dr. Minal Krishnamurthy, state agency physicians who reviewed Valentine's DIB and SSI claims in 2014, stated that Valentine's obesity would "worsen[] her [lower extremity] function by increasing pain." *See* R. 51, 67. In 2015 and 2016, Valentine also sought treatment for right ankle pain, R. 482-83 (January 6, 2015); R. 507-08 (March 2, 2015); R. 547 (January 7, 2015); R. 776 (November 12, 2016), and depression, R. 530 (May 11, 2015); R. 583-90 (April 27, 2016).

As a result of these conditions, Valentine also sought treatment for pain. On May 11, 2015, Valentine visited Dr. Tricia Chan, her primary care physician at Bronxcare, and reported

4

that the Naprosyn she was taking was not controlling her pain.  R. 530-33.  Dr. Chan suggested that Valentine try Tramadol, but Valentine refused because it caused dizziness.  R. 532.  Dr. Chan rejected Valentine's request for a prescription of Oxycodone because of concerns about addiction, R. 532, with which Valentine had struggled in the past, R. 617 (Dr. Hafeez's notes indicating that Valentine reported nearly becoming addicted to Percocet).  On June 21, 2016, Dr. Chan requested home care services for Valentine, because she believed Valentine required assistance walking outside the house, going to the bathroom, bathing, and dressing.  R. 621.  She visited Dr. Saqib Hafeez on April 26, 2016, a pain management specialist at Bronxcare.  R. 614-18.  Valentine reported that she had a "long standing [history] of chronic low[er] back pain."  R. 617.  Dr. Hafeez recommended a trial of Gabapentin and additional physical therapy.  R. 618.

Several non-examining physicians also provided their assessments.  In 2014, Dr. Gioia assessed that Valentine can stand or walk for two hours out of an eight-hour day, sit for six hours, and that her right hand's gross and fine manipulations were "[l]imited."  R. 49-50.  Dr. Krishnamurthy concurred with Dr. Gioia's assessment.  R. 65-66.

## PROCEDURAL HISTORY

Valentine first filed her application for DIB and SSI benefits on February 26, 2014, and March 7, 2014, respectively, claiming that she had been disabled beginning on February 23, 2014.  R. 10.  Her claims were denied initially and upon reconsideration on October 21, 2014.  *Id.*  Valentine requested a hearing, which was held on December 6, 2016.  On that date, Valentine also amended her claimed onset date to January 1, 2015.  R. 211.

On December 6, 2016, an administrative law judge ("ALJ") held an administrative hearing. Valentine testified during the hearing, as did Dr. Robert Sklaroff,[2] a non-examining medical expert, and Robert Baker, a vocational expert. Dr. Sklaroff testified that Valentine could sit, stand, or walk "up to six hours during a normal eight-hour day" and had no limits on the use of her hands. R. 901, 906. Following the hearing, Valentine submitted an additional medical report from Dr. Auerbach, along with other records. R. 299, 792-800. The ALJ issued a decision on March 1, 2017. R. 30. As relevant here, the ALJ found that Valentine: (1) met the insured status requirements of the Act through December 31, 2015; (2) had not engaged in substantial gainful activity since January 1, 2015, the amended alleged onset date; (3) had severe impairments including carpal tunnel syndrome, bilateral knee disorder, asthma, obesity, sleep apnea, L4-5 spondylolisthesis and degenerative disc disease, gastroesophageal reflux disorder, Achilles tendonitis, mild osteoarthritis, and depression; (4) did not have an impairment or combination of impairments that met or exceeded the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; (5) had the residual capacity to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b); (6) was unable to perform any past relevant work; (7) was able to perform jobs that exist in significant numbers in the national economy; and, accordingly, (8) was not disabled, as defined in the Act, from January 1, 2015 through the date of the decision. R. 10-31.

Valentine filed a request for Appeals Council review on April 12, 2017. R. 31. On December 7, 2017, the Appeals Council declined review, at which point the ALJ's decision became final. R. 2-6. On January 29, 2018, Valentine instituted this action, and it was referred

---

[2] In the record, Dr. Sklaroff is referred to as "Robert E. Swarf," *see* R. 896, but the Court assumes that this is an error in transcription given the consistent use of "Sklaroff."

to Magistrate Judge Fox for a Report and Recommendation. Valentine filed a motion for judgment on the pleadings on August 22, 2018, and the Commissioner cross-moved on October 22, 2018. On August 16, 2019, Magistrate Judge Fox recommended that the Commissioner's motion be denied and that Valentine's motion be granted by reversing and remanding the case to the Commission for further proceedings. The Commissioner did not object to Magistrate Judge Fox's recommendation of reversal, but Valentine objected to the recommendation that the case be remanded for a rehearing, rather than solely for the calculation of benefits.

## LEGAL STANDARDS

In reviewing a Report and Recommendation, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). A district court "must determine de novo any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(3); *see also United States v. Male Juvenile*, 121 F.3d 34, 38 (2d Cir. 1997). To accept those portions of the report to which no timely objection has been made, however, a district court need only satisfy itself that there is no clear error on the face of the record. *See, e.g.*, *Wilds v. United Parcel Serv., Inc.*, 262 F. Supp. 2d 163, 169 (S.D.N.Y. 2003). This clearly erroneous standard also applies when a party makes only conclusory or general objections, or simply reiterates his original arguments. *See, e.g.*, *Ortiz v. Barkley*, 558 F. Supp. 2d 444, 451 (S.D.N.Y. 2008).

Meanwhile, judicial review of DIB and SSI decisions by the Commissioner is limited. In particular, a court may set aside a final decision of the Commissioner only if his findings are not supported by "substantial evidence" or the decision was based on legal error. *Zabala v. Astrue*, 595 F.3d 402, 408 (2d Cir. 2010); *accord Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000). "It

is not the function of a reviewing court to decide *de novo* whether a claimant was disabled."
*Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999).

## DISCUSSION

The Report and Recommendation recommended that the Court (1) grant judgment in favor of Valentine and (2) remand to the Commissioner for a further hearing. The Court will review both recommendations, beginning with the recommendation to grant Valentine's motion for judgment on the pleadings — to which the Commissioner has not objected.

### A. The Commissioner's Decision

The Commissioner has waived any objection to Magistrate Judge Fox's recommendation that the Commissioner's motion for judgment on the pleadings be denied, Valentine's motion be granted, and the ALJ's decision be reversed. Despite the waiver, the Court has reviewed that recommendation and finds it to be well reasoned and grounded in fact and law.

In particular, the ALJ's decision violates the "treating physician rule," which requires that a treating physician's medical opinion on the nature and severity of the claimant's impairment be given controlling weight, provided that it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 416.927(c)(2). The ALJ gave the opinions of three of Valentine's treating physicians — Dr. Rust, Dr. Glushakow, and Dr. Chan — less than controlling weight, but the regulatory prerequisites for doing so were not present. R. 24-25. For instance, the ALJ's decision merely recites that these doctors' medical opinions "are not well-supported by medically acceptable clinical and diagnostic techniques," but it fails to explain *how* they are inadequate. *Id.* So too, the Commissioner was unable to marshal an argument that the findings of Valentine's treating

8

physicians were not supported by acceptable clinical and diagnostic techniques, instead relying on conclusory assertions. ECF No. 20 ("Comm.'s Mem."), at 23-24.

Nor did the ALJ cite substantial evidence contradicting the treating physicians' opinions. The ALJ's decision rested largely on the opinion of Dr. Sklaroff, a non-examining medical expert, who did not see critical portions of Valentine's medical record, most notably results from Valentine's 2015 knee MRI. R. 905 ("If there's something [regarding Valentine's knee condition] more recent than [the 2013 MRI, I] don't know it."); R. 908 (testifying that he did not receive Exhibit 31F, in which record of the 2015 MRI was contained). In addition, Dr. Sklaroff failed even to address the fact that Valentine's 2015 spinal MRI revealed five herniated discs, among other injuries. In light of Dr. Sklaroff's undisputed failure to review important portions of the medical record, his opinion does not constitute substantial evidence. *See Tarsia v. Astrue*, 418 F. App'x 16, 18 (2d Cir. 2011) (summary order) ("Because it is unclear whether [the non-examining physician] reviewed all of [the claimant's] relevant medical information, his opinion is not supported by evidence of record as required to override the opinion of [the] treating physician." (internal quotation marks omitted)).

Other evidence with which the ALJ found the treating physicians' opinions to be in conflict is similarly not substantial. The ALJ discounted Dr. Rust's August 2013 opinion that, due to Valentine's degenerative joint disease of the knee, she should be restricted to standing no more than three hours per day because of evidence that "often indicated the claimant had normal muscle strength." R. 24. But Valentine's knee problems did not relate to muscle strength. And although Dr. Rust's opinions "predate [Valentine's] alleged onset date of disability," the record indicates that, if anything, her condition was *worse* during the relevant period, not better. *See* R. 472 (January 5, 2015 exam); R. 793-94 (March 13, 2015 MRI results). The ALJ also discounted

9

Dr. Chan's opinion that Valentine required assistance to walk outside the home, go to the toilet, and bathe because there was evidence that Valentine had reported pain relief and that she was "neurologically intact." R. 24-25 (citing R. 617, 622). Neither fact, however, is inconsistent with Dr. Chan's opinions; that is, receiving "some improvement" in pain from "steroid injections" does not imply complete relief, R. 617, and a physician's finding that Valentine's cranial nerves were "grossly intact" is hardly relevant to the question, R. 622 ("CN II-XII grossly intact"). Moreover, during the exam in which Valentine's cranial nerves were found "grossly intact," Valentine reported "8/10 pain on and off[,] worse with movement[,] better with rest." *Id.* Meanwhile, Dr. Glushakow's opinion that Valentine was "substantially impaired" by carpal tunnel syndrome was given little weight because examination results from 2016 did not indicate abnormalities. R. 25. Even if the Court agreed with the ALJ that some medical findings were in tension with the treating physicians' opinions, an ALJ "is not free to set his own expertise against that of a physician who submitted an opinion to or testified before him." *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) (alterations and internal quotation marks omitted). The ALJ's decision must therefore be reversed.

**B. Scope of Remand**

The Court turns, then, to the portion of Magistrate Judge Fox's Report and Recommendation to which Valentine has objected: his recommendation that her case be remanded to the agency for a rehearing, rather than solely for the calculation of benefits. *See* R&R 18. A court reviewing a Commissioner's final decision may, in its discretion, remand a claim for further proceedings or solely for the calculation of benefits. *See Butts v. Barnhart*, 388 F.3d 377, 385 (2d Cir. 2004) (holding that the district court's exercise of the remand authority granted by 42 U.S.C. § 405(g), sentence four, is discretionary). Remand for further proceedings

is warranted if the ALJ "applied an improper legal standard," *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980), or if there are gaps in the administrative record such that further findings would "plainly help to assure the proper disposition of [the disability] claim," *Butts*, 388 F.3d at 385 (internal quotation marks omitted). Where "the record provides persuasive proof of disability" and the record is complete, however, remand solely for the calculation of benefits is the appropriate and preferred remedy. *Parker*, 626 F.2d at 235.

In this case, Valentine has proffered persuasive evidence of her disability. In particular, Dr. Rust, who treated Valentine's degenerative disease of the knee, concluded in August 2013 that she could not stand for more than three hours per day. R. 363-65. Valentine's condition only worsened thereafter. A knee MRI conducted in March 2015 revealed significant damage to both knees, including meniscal tears, whereas only her right knee had been implicated in 2013. R. 793-94. Dr. Chan, Valentine's primary care physician in 2015, found that she needed assistance walking outside the home, bathing, dressing, and going to the bathroom. R. 621. And as described in detail above, neither of these treating physicians' opinions are contradicted by substantial evidence, and they are therefore controlling. 20 C.F.R. § 416.927(c)(2). An April 2015 MRI of Valentine's spine revealed five herniated discs. *See* R. 467-68. Dr. Auerbach, although not a treating physician, reviewed the spinal MRI results, conducted an exam, and provided his opinion that Valentine could sit for only about four hours and stand or walk for less than two hours, "with frequent breaks." R. 800. This evidence demonstrates that Valentine could not perform even sedentary work.

The Commissioner offers little to counter this persuasive evidence of disability. Dr. Sklaroff's opinion — upon which the Commission relies, *see* ECF No. 25 ("Opp'n"), at 4-6 — is of little use for the reasons discussed in detail above. And although the Commissioner is correct

that the fact that Dr. Sklaroff did not review the entire record is not evidence *in favor of* a finding of disability, it *does* prevent his opinion from negating the substantial evidence favoring Valentine in the record. The Commissioner also cites a number of physical examination findings, noting that "a residual functional capacity assessment [may be] based on examination findings alone . . . after rejecting medical opinions of record." Opp'n 4-5. That may be true, but it is inapplicable when treating physician opinions are *not* properly rejected. Such is the case here. Again, an ALJ may not "set his own expertise against that of a physician who [submitted an opinion to or] testified before him." *Balsamo*, 142 F.3d at 81.

Finally, Valentine contends, and the Commissioner does not dispute — despite opportunities to do so, both before this Court and before Magistrate Judge Fox — that there are no gaps in the administrative record. *See* Plf's Obj. at 4-5. In particular, the Commissioner does not request an opportunity to put forth another expert who *has* reviewed the medical record or a chance to adduce additional testimony from a vocational expert regarding jobs that Valentine can perform given the limitations her treating physicians described. Although the ALJ "owes a duty to the Commissioner" to develop the record because the Commissioner has no representative at the agency level, *Butts*, 388 F.3d at 386, the Commissioner is represented here, and the Court owes him no such duty, *cf. Butts v. Barnhart*, 416 F.3d 101, 104 (2d Cir. 2005) ("We deemed the district court's decision to remand for further proceedings rather than a benefits calculation as not constituting an abuse of discretion only because, *at her request*, we allowed . . . the Commissioner . . . a second chance to present evidence." (emphasis added)). In short, because the record contains "persuasive proof of disability and a remand for further evidentiary

proceedings would serve no purpose," the Court concludes that the case should be remanded to the Commissioner solely for the calculation and payment of benefits.  *Parker*, 626 F.2d at 235.

## CONCLUSION

The Court adopts the Report and Recommendation to the extent that it recommends denying the Commissioner's motion for judgment on the pleadings and granting Valentine's motion.  The Court, however, does not adopt the Report and Recommendation's recommendation to remand the case to the Commissioner for further proceedings; instead, for the reasons stated above, the case is REMANDED solely for the calculation of benefits.

The Clerk of Court is directed to terminate ECF Nos. 17 and 19 and to close the case.

SO ORDERED.

Dated: September 25, 2019
      New York, New York

JESSE M. FURMAN
United States District Judge